IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **(1)** | **DEDRICK D. REED,** | ) |
| | | ) |
| | Plaintiff, | ) |
| | | ) Case No. 14-CV-423-CVE-FHM |
| vs. | | ) |
| | | ) |
| **(1)** | **H & H ROAD BORING** | ) |
| | **COMPANY, LLC.** | ) |
| | Defendant. | ) |

**MOTION FOR PARTIAL SUMMARY JUDGMENT
ON PLAINTIFF'S TITLE VII CLAIMS**

**COMES NOW** the Defendant, **H & H ROAD BORING COMPANY, LLC,** by and
through its attorney, Randall A. Gill, and moves this Court for partial Summary Judgment in
accordance with Fed.R.Civ.p.56 and LCvR56.1 on the first, third and fourth causes of action filed
under Title VII of the Amended Petition of the Plaintiff. The Defendant states there is no material
dispute that: (1) Plaintiff failed to file within 90 days of the receipt of Notice of Right to Sue letter
under the prerequisites of Title VII USC §2000(e)(5)(f)(1) and 29 CFR Part 1601.28(e)(1); and, (2)
the jurisdictional requirements of 42 USC §2000(e)(b) as the Defendant employer has fewer than 15
employees and is not subject to Title VII. In support, the Defendant would show the Court as
follows:

*FAILURE TO FILE WITHIN 90 DAYS*

1.      The first cause of action (racial discrimination) filed by the Plaintiff in this matter is
based upon discrimination under Title VII found in 42 USC §2000(e) *et seq.* The third cause of action
alleges creation of a hostile work environment also under Title VII. The fourth cause of action for
retaliation is under Title VII of the same statute. See Plaintiff's Amended Petition (See Docket No
2, Exhibit 2). All of these causes of action are based upon Title VII in 42 USC §2000(3) *et seq.* The

Amended Petition (now Complaint) clearly pleads federal causes based upon Title VII of 42 USC §2000(e).

2.      These three causes of action have a limited period of time for filing a petition/complaint in accordance with the Federal statutes governing actions brought by an employee against an employer.  The Plaintiff states in his Amended Petition that he received the Notice of Right to Sue letter on or about January 16, 2014 from the Equal Employment Opportunity Commission.  See Paragraph 5 of the Amended Petition removed to this Court (see Docket No. 2 attached to Notice of Removal as Exhibit 2).  No copy of the Notice of Right to Sue letter has been produced by the Plaintiff or attached to his Amended Petition.

3.      The Defendant did not file his Amended Petition naming H & H Road Boring Company, LLC in the District Court of Rogers County, State of Oklahoma, until July 11, 2014.  See filing date on Amended Petition (Docket No. 2 attached to Notice of Removal as Exhibit 2).

4.      The Amended Petition naming H & H Road Boring Co. was not filed within the 90 day requirement as required by Title VII of 42 USC §2000(e)(5)(f)(I) and 29 CFR Part 1601.28(e)(1).  Both of the above cited statutory/regulatory provisions provide for a 90 day time limit on the employee to bring an action after receiving a Notice of Right to Sue letter.

5.      The Plaintiff commenced his action originally against H & H Boring Company on April 15, 2014.  H & H Boring Company is based in Guthrie, Oklahoma at Rt 5, Box 646, 73044. H & H Boring Company is not related to, nor a part of, H & H Road Boring Company, LLC.  (See Affidavit of Gerald Hail attached as Exhibit 1).  H & H Road Boring Company, LLC is located in Inola, Oklahoma.

6.      Plaintiff amended his Petition on July 11, 2014 to join H & H Road Boring Co. (actually H & H Road Boring Company, LLC) after attempting service on the wrong entity known

as H & H Boring Company in Guthrie, Oklahoma. (Docket No. 2 attached to Notice of Removal as Exhibit 3). Plaintiff's case against H & H Road Boring Company, LLC of Inola, Oklahoma was not filed or brought against the correct party or entity within the 90 day time limit.

7.      The action against H & H Road Boring Company, LLC was not commenced until 176 days after the January 16, 2014 Notice of Right to Sue letter was received, well over the 90 days allowed by the above referenced statutes and regulations for the bringing of a complaint or action.

8.      The first, third and fourth causes of action should be dismissed and judgment rendered in favor the Defendant for the failure of the Plaintiff to bring his claims within the 90 day time limit under Title VII of 42 USC §2000(3) *et seq.* The Defendant should be allowed its attorney's fees and costs with the dismissal and judgment.

### *DEFENDANT IS AN EXEMPT EMPLOYER WITH UNDER 15 EMPLOYEES*

9.      In addition, the Defendant is exempt under 42 USC §2000(e)(b). 42 USC §2000(e)(b) provides that the term "employer" means a person engaged in an industry affecting commerce who has 15 or more employees (emphasis supplied) for each working day in each of 20 or more calendar weeks in the current or preceding calendar year . . . An employer with under 15 employees is exempt from the applicability of Title VII claims.

10.      The Affidavit of Gerald Hail, Manager of H & H Road Boring Company, LLC, is attached as Exhibit 1 which states that the Defendant employer has had a total average of 5-7 employees (both full and part-time) at any given time during its history. It has never exceeded 7 employees which includes the owners and office personnel of H & H Road Boring Company, LLC. Defendant employer has never had 15 or more employees in its entire history, including the year of the alleged violation (2013) or the preceding year (2012).

11.     As an employer with less than 15 employees, the provisions of Title VII of 42 USC

§2000(3) *et seq.* do not apply to H & H Road Boring Company, LLC.  See *Walters vs. Metropolitan*

*Educational Enterprises, Inc.*, 519 U.S. 202, 117 S.Ct. 660 and 136 L.Ed.2d 644 (1997) (copy

attached as Exhibit 2) which interpreted the 15 employee threshold for the applicability of Title VII

claims.

12.     In *Davenport vs. Hansa World USA, Inc.*, the United States District Court for the

Southern District of Mississippi decision on May 20, 2014 (copy attached as Exhibit 3), the United

States District Court for the Southern District of Mississippi Eastern Division held that the Plaintiff's

causes of action under Title VII of 42 USC §2000(e) *et seq.* could not stand against an employer with

less than 15 employees as the threshold under Title VII of 42 USC §2000(e)(b).  The case conducts

the analysis required in order to determine whether an employer meets the 15 employee threshold.

13.     The Affidavit of Gerald Hail attached hereto, who is the Manager of H & H Road

Boring Company, LLC, satisfies the analysis.

14.     The Defendant, H & H Road Boring Company, LLC, requests that this Court render

judgment in favor of H & H Road Boring Company, LLC on the first, third and fourth causes of

action based upon Title VII as the Defendant is exempt from the applicability of Title VII of 42 USC

§2000(e) *et seq.* for failure to meet the 15 employee threshold.

**WHEREFORE**, premises considered, the Defendant requests this Court grant judgment to

the Defendant under the first, third and fourth causes of action based upon Title VII for failure to file

within 90 days and failure to meet the 15 employee threshold creating an exemption for H & H Road

Boring Company, LLC, together with its attorney's fees and costs incurred by H & H Road Boring

Company, LLC in accordance with Title VII of 42 USC §2000(e)(k) which allows the prevailing

party reasonable costs, including attorney's fee as part of the cost for the Title VII claims, and for such other and further relief that the Court deems just and proper in the premises.

Respectfully submitted,

/s/ Randall A. Gill
**RANDALL A. GILL**, OBA #10309
2512 East 21st Street
Tulsa, Oklahoma 74114-1706
(918) 747-1958
(918) 747-1108 fax

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of August, 2014, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Daniel E. Smolen

/s/ Randall A. Gill
Signature

## EXHIBIT 1 - AFFIDAVIT OF GERALD HAIL

I, Gerald Hail, being first duly sworn upon oath states as follows:

1.      I am the Manager of H & H Road Boring Company, LLC. H & H Road Boring Company, LLC was formed on the 30th day of March, 2006.

2.      I have been the Manager of H & H Road Boring Company, LLC since its inception.

3.      I am familiar with all of the activities of H & H Road Boring Company, LLC and its employees. I have reviewed all of the payroll records and personally sign all payroll checks for all employees of the company since its inception.

4.      Based upon my review of the payroll records and my knowledge of the company history and its employees since its inception, I hereby state that the company has never had 15 or more employees in its entire history.  The company average is between 5 and 7 employees based upon the work involved.  The total of the employees includes the owners of the company and all office personnel.

5.      The average of 5-7 employees includes the time period that the Plaintiff was an employee, as well as the preceding year.

6.      H & H Road Boring Company, LLC is not related to, nor has it ever been a part of H & H Boring Company of Rt 5, Box 646, Guthrie, Oklahoma 73044. As manager of, and principal owner of H & H Road Boring Company, LLC, we conduct our operations and business principally from Inola, Oklahoma.

7.      Affiant further sayeth not.

**GERALD HAIL**
14157 East 580 Road
Inola, OK 74036

**SUBSCRIBED AND SWORN** to before me, the undersigned Notary Public this 18th day of _____August_____, 2014.

MARY WALTER
Notary Public
State of Oklahoma
Commission # 03008165  Expires 07/09/15

Notary Public

**Randall A. Gill**

| | |
|---|---|
| **From:** | noreply@fastcase.com |
| **Sent:** | Tuesday, August 05, 2014 4:12 PM |
| **To:** | Gill-Law@swbell.net |
| **Subject:** | Fastcase Document - Walters v. Metropolitan Educ. Enter. |

*(This document has been sent to you from <u>Fastcase</u> by Randall Gill)*

**519 U.S. 202**
**117 S.Ct. 660**
**136 L.Ed.2d 644**

**Darlene WALTERS, Petitioner,**

v.

**METROPOLITAN EDUCATIONAL ENTERPRISES, INC. and Leonard Bieber.**

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Petitioner,**

v.

**METROPOLITAN EDUCATIONAL ENTERPRISES, INC., and Leonard Bieber.**

**Nos. 95-259, 95-779.**
**Supreme Court of the United States**
**Argued Nov. 6, 1996.**
**Decided Jan. 14, 1997.**
*Syllabus*[*]

   In 1990, petitioner Walters was fired by respondent Metropolitan Educational Enterprises, Inc., soon after she filed an employment discrimination charge against it under Title VII of the Civil Rights Act of 1964. Petitioner Equal Employment Opportunity Commission (EEOC) sued Metropolitan, alleging that the firing violated Title VII's antiretaliation provision. After Walters intervened, Metropolitan filed a motion to dismiss for lack of subject-matter jurisdiction, claiming that it was not an "employer" covered by Title VII because, at the time of the alleged retaliation, it was not "a person . . . who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 2000e(b). The parties have stipulated that Metropolitan failed to satisfy the 15-employee threshold in 1989; that, during most of 1990, it had between 15 and 17 employees on its payroll on each working day; and that, during 1990, there were only nine weeks in which it was actually compensating 15 or more employees on each working day. The District Court dismissed the case, relying on Circuit precedent to the effect that employees may be counted for § 2000e(b) purposes only on days on which they actually performed work or were being compensated despite their absence. The Seventh Circuit affirmed.

   *Held:* The u ltimate touchstone under § 2000e(b) is whether an employer has employment relationships with 15 or more individuals for each working day in 20 or more weeks during the year in question. Pp. ___-___.

Exhibit 2

(a) The "payroll method"-which looks to whether the employer has an employment relationship with the employee on the day in question, as is most readily demonstrated by the individual's appearance on the employer's payroll-represents the fair reading of the statutory language. That method embodies the ordinary, contemporary, common meaning of "has [an] employe[e]." While the phrase "for each working day" suggests the possibility of a test based on whether an employee is actually at work on a given day, such a test would be impossible to administer and reflects an improbable reading of the statute. The method advocated by Metropolitan, which focuses on whether an employer is compensating the employee on the day in question, is not a plausible reading of the statutory criterion of whether the employer "has" the employee. Pp. ___-___.

(b) The payroll approach does not render superfluous the statutory qualification "for each working day." Without this phrase, one would not be sure whether to count part-week employees toward the statutory minimum. Nor is it dispositive that the payroll method produces some strange consequences with regard to Title VII's coverage, since Metropolitan's approach produces unique peculiarities of its own. The latter approach would also turn the coverage determination into an incredibly complex and expensive factual inquiry, whereas, under the payroll method, all one needs to know about a given employee for a given year is whether he started or ended employment during that year and, if so, when. He is counted as an employee for each working day after arrival and before departure. Pp. ___-___.

(c) Under the payroll method, Metropolitan was an "employer" for purposes of petitioners' retaliatory-discharge claim. P. ___.

60 F.3d 1225 (C.A.7 1995), reversed and remanded.

SCALIA, J., delivered the opinion for a unanimous Court.

　　Constantine John Gekas, Chicago, IL, for petitioner in No. 95-259.

　　Seth P. Waxman, Washington, DC, for petitioner in No. 95-779.

　　Patrick J. Falahee, Jr., Chicago, IL, for respondents.

　　Justice SCALIA delivered the opinion of the Court.

　　Title VII of the Civil Rights Act of 1964 applies to any employer who "has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." 78 Stat. 253, as amended, 42 U.S.C. § 2000e(b). These cases present the question whether an employer "has" an employee on any working day on which the employer maintains an employment relationship with the employee, or only on working days on which the employee is actually receiving compensation from the employer.

I

　　Petitioner Darlene Walters was employed by respondent Metropolitan Educational Enterprises, Inc., a retail distributor of encyclopedias, dictionaries, and other educational materials. In 1990, she filed a charge with the Equal Employment Opportunity Commission (EEOC), claiming that Metropolitan had discriminated against her on account of her sex in failing to promote her to the position of credit manager. Soon after that, Metropolitan fired her.

　　On April 7, 1993, petitioner EEOC filed suit against Metropolitan and its owner, respondent Leonard Bieber (hereinafter collectively Metropolitan), alleging that the firing constituted unlawful retaliation. Walters intervened in the suit. Metropolitan filed a motion to dismiss for lack of subject-matter jurisdiction, claiming that the company did not pass the 15-employee threshold for coverage under Title VII.

The District Court granted Metropolitan's motion to dismiss, 864 F.Supp. 71 (N.D.Ill.1994), relying on _Zimmerman v. North American Signal Co., 704 F.2d 347_, 354 (C.A.7 1983), which affirmed a District Court's decision to count employees toward the 15-employee threshold only on days on which they actually performed work or were being compensated despite their absence. On appeal from the District Court's judgment, the Court of Appeals reaffirmed _Zimmerman._ 60 F.3d 1225 (C.A.7 1995). We granted certiorari. 516 U.S. ----, 116 S.Ct. 1260, 134 L.Ed.2d 209 (1996).

II

Petitioners' suit rests on Title VII's antiretaliation provision, 42 U.S.C. § 2000e-3(a), which makes it unlawful for an employer to discriminate against any of its employees for filing complaints of discrimination. Metropolitan was subject to Title VII, however, only if, at the time of the alleged retaliation, it met the statutory definition of "employer," to wit: "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 2000e(b).

Metropolitan's "working days" are Monday through Friday, and the "current" and "preceding" calendar years for purposes of the retaliatory-discharge claim are 1990 and 1989. The parties have stipulated that Metropolitan failed to satisfy the 15-employee threshold in 1989. During most of 1990, Metropolitan had between 15 and 17 employees on its payroll on each working day; but in only nine weeks of the year was it actually compensating 15 or more employees on each working day (including paid leave as compensation). The difference resulted from the fact that Metropolitan had two part-time hourly employees who ordinarily skipped one working day each week. *FDW* Walters (but not the EEOC) alleged that, in addition to violating Title VII's antiretaliation provision, Metropolitan also violated the basic antidiscrimination provision, 42 U.S.C. § 2000e-2(a), by failing to promote her to credit manager in September 1989. In granting Metropolitan's motion to dismiss, the District Court stated that the relevant years for determining Metropolitan's status as an employer were 1989 and 1990. 864 F.Supp. 71, 72 (N.D.Ill.1994). For purposes of Walters' _discrimination_ claim, however, the relevant years were 1988 and 1989. Because Walters did not mention this issue in her petition for certiorari or her brief on the merits, we treat any objection to the District Court's disposition of the matter as waived.

A

The parties agree that, on any particular day, all of the individuals with whom an employer has an employment relationship are "employees" of that employer. See 42 U.S.C. § 2000e(f) (defining "employee" to mean "an individual employed by an employer"). Thus, individuals who are not receiving compensation from their employer on the day in question nonetheless qualify as "employees" on that day for purposes of § 2000e(b)'s definition of "employer." Respondents contend, however, and the Seventh Circuit held here, that an employer "has" an employee for a particular working day within the meaning of § 2000e(b) only when he is actually compensating the individual on that day. This position has also been adopted by the Eighth Circuit. See _EEOC v. Garden & Associates, Ltd., 956 F.2d 842_, 843 (1992).

Petitioners contend that the test for when an employer "has" an employee is no different from the test for when an individual _is_ an employee: whether the employer has an employment relationship with the individual on the day in question. This test is generally called the "payroll method," since the employment relationship is most readily demonstrated by the individual's appearance on the employer's payroll. The payroll method was approved in dictum by the Fifth Circuit in _Dumas v. Mount Vernon, 612 F.2d 974_, 979, n. 7 (1980), and was adopted by the First Circuit in _Thurber v. Jack Reilly's, Inc., 717 F.2d 633_, 634-635 (1983), cert. denied, 466 U.S. 904, 104 S.Ct. 1678, 80 L.Ed.2d 153 (1984); see also _Vera-Lozano v. International Broadcasting, 50 F.3d 67_, 69-70 (C.A.1 1995) (reaffirming _Thurber_ ). The payroll method has also been adopted by the EEOC under the Age Discrimination in Employment Act of 1967, which defines "employer" in precisely the way Title VII

3

does. See 29 U.S.C. § 630(b); Equal Employment Opportunity Commission Notice No. N-915-052, Policy Guidance: Whether Part-Time Employees Are Employees (Apr.1990), reprinted in App. to Pet. for Cert. 30a-40a (hereinafter EEOC Policy Guidance). The Department of Labor has likewise adopted the payroll method under the Family and Medical Leave Act of 1993, which defines "employer" as a person who "employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year." See 29 U.S.C. § 2611(4)(A)(i); 29 CFR §§825.105(b)-(d) (1996). In its administration of Title VII, the EEOC has expressed a preference for the payroll method, see EEOC Policy Guidance, but it lacks rulemaking authority over the issue, see 42 U.S.C. § 2000e-12(a); _EEOC v. Arabian American Oil Co.,_ 499 U.S. 244, 257, 111 S.Ct. 1227 1235, 113 L.Ed.2d 274 (1991).

We think that the payroll method represents the fair reading of the statutory language, which sets as the criterion the number of employees that the employer "has" for each working day. In the absence of an indication to the contrary, words in a statute are assumed to bear their "ordinary, contemporary, common meaning." _Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership,_ 507 U.S. 380, 388, 113 S.Ct. 1489 1495, 123 L.Ed.2d 74 (1993) (internal quotation marks and citation omitted). In common parlance, an employer "has" an employee if he maintains an employment relationship with that individual. See 1 The New Shorter Oxford English Dictionary 1198 (1993) (def. 2: defining "have" to mean to "[p]ossess in a certain relationship"); American Heritage Dictionary 828 (3d ed.1992) (def. 2: defining "have" to mean "to occupy a particular relation to"; giving as an example "had a great many disciples"); Webster's New International Dictionary 1145 (2d ed.1950) (def. 2: defining "have" to mean "[t]o possess, as something which appertains to, is connected with, or affects, one"; giving as an example "to have an ungrateful son").

Metropolitan contends that if one were asked how many employees he had _for a given working day,_ he would give as the answer the number of employees who were actually performing work on that day. That is possibly so. Language is a subtle enough thing that the phrase "have an employee _for_ a given _working_ day" (as opposed to "have an employee on a given day") may be thought to convey the idea that the employee must actually be working on the day in question. But _no one_ before us urges _that_ interpretation of the language, which would count even salaried employees only on days that they are actually working. Such a disposition is so improbable and so impossible to administer (few employers keep daily attendance records of all their salaried employees) that Congress should be thought to have prescribed it only if the language could bear no other meaning. Metropolitan's own proposed test does not focus on the question "How many employees did you have at work on a particular working day?" but rather the question "How many employees were you _compensating_ on that day?" That question, unlike the other one, simply cannot be derived from any possible reading of the text.

B

The Court of Appeals rejected the straightforward meaning of "has fifteen or more employees" in § 2000e(b) because of a different supposed consequence of the added statutory qualification "for each working day." In its view, if only the employment relationship were the intended focus, the statute would simply have required the employer to "ha[ve] fifteen or more employees in each of twenty or more calendar weeks," without the further refinement "for each working day" of each of those weeks. This point would have some force (though it would still not produce the Court of Appeals' focus on the number of employees being _compensated_ on a particular day) if indeed the ordinary meaning of "has fifteen or more employees" rendered "for each working day" superfluous. Statutes must be interpreted, if possible, to give each word some operative effect. _United States v. Menasche,_ 348 U.S. 528, 538-539, 75 S.Ct. 513, 519-520, 99 L.Ed. 615 (1955). But we do not agree that giving "has fifteen or more employees" its ordinary meaning renders "for each working day" superfluous. Without that qualification, it would be unclear whether an employee who departed in the middle of a calendar week would count toward the 15-employee minimum for that week; with the qualification, it is clear that he does not. Similarly, the adjective "working" within the phrase "for each working day" eliminates any ambiguity about whether employees who depart after the end of the workweek, but before the end of the calendar week, count toward the 15-employee minimum for that week.

The Court of Appeals thought that the mere exclusion of part-week employees was an improbable purpose of the phrase. "[I]nstances where employees begin work on Wednesdays or depart on Thursdays," it said, "are unlikely to occur with sufficient frequency to merit inclusion in a federal anti-discrimination statute." 60 F.3d, at 1228. But it is not a matter of carving out special treatment for this (supposedly minuscule) class-as would be the case if, without the phrase "for each working day," part-week employees would unquestionably be counted toward the statutory minimum. Without the phrase *one would not be sure* whether to count them or not, and in at least some cases the matter would have to be litigated. (Does a company have 15 employees "in" a week where, on all except the last workday, it has only 14? "In" a week where it hires a new employee on Saturday, a nonworkday, to begin on the next Monday? "In" a week where, in midweek, one of 14 employees quits and is replaced by a different 14th employee?) We are decidedly of the view that the "mere" elimination of evident ambiguity is ample-indeed, admirable-justification for the inclusion of a statutory phrase; and that purpose alone is enough to "merit" enactment of the phrase at issue here. Moreover, the phenomenon of mid-week commencement and termination of employment seems to us not as rare as the Court of Appeals believed. For many businesses payday, and hence hiring- and firing-day, is the end of the month rather than the end of the week. Metropolitan itself experienced 10 mid-week arrivals or departures from its roughly 15-employee work force during 1990. Brief for Petitioner in No. 95-259, pp. 10-11.

Metropolitan points out that the interpretation we adopt produces some strange consequences with regard to the coverage of Title VII. For example, an employee who works irregular hours, perhaps only a few days a month, will be counted toward the 15-employee minimum for every week in the month. Metropolitan's approach reduces this problem (though it does not eliminate it entirely): The employee will be counted so long as he works one hour each day of the workweek. On the other hand, Metropolitan's approach produces unique peculiarities of its own: A company that has 15 employees working for it on each day of a 5-day workweek is covered, but if it decides to add Saturday to its workweek with only one less than its full complement of employees, it will become exempt from coverage (despite being in fact a "larger" business). Unsalaried employees who work the same number of hours per week are counted or not counted, depending on how their hours are scheduled. A half-time worker who works only mornings is counted; a half-time worker who works alternate days is not. The fact is that neither interpretation of the coverage provision can cause it to be an entirely accurate measure of the size of a business.

In any event, Metropolitan ought to be reluctant to appeal to practical consequences as the basis for deciding the question before us. The approach it suggests would turn the cove rage determination into an incredibly complex and expensive factual inquiry. Applying it in the present cases required the parties to spend 10 months poring over Metropolitan's payroll registers, time cards, work diaries, and other time-keeping records to determine, for each working day of a 2-year period, how many employees were at work, how many were being paid on salaries, how many were on paid holiday leave, how many were on paid vacation leave, and how many were on paid sick leave. For an employer with 15 employees and a 5-day workweek, the number of daily working histories for the 2-year period is 7,800. The problems with Metropolitan's compensation-based approach are magnified when employees are "compensated" on days off in ways less clear cut than holiday, vacation, or sick leave. If, for example, employees accumulate seniority rights or entitlements to holiday bonuses on their unpaid days off, it would be necessary to determine (or litigate) whether they are "receiving compensation" on those days for purposes of the coverage determination. Under the interpretation we adopt, by contrast, all one needs to know about a given employee for a given year is whether the employee started or ended employment during that year and, if so, when. He is counted as an employee for each working day after arrival and before departure.

III

As we have described, in determining the existence of an employment relationship, petitioners look first and primarily to whether the individual in question appears on the employer's payroll. Metropolitan did not challenge this aspect of petitioners' approach; its objection was the more basic one that existence of an

employment relationship was not the criterion. For their part, petitioners emphasize that what is ultimately critical under their method is the existence of an employment relationship, not appearance on the payroll; an individual who appears on the payroll but is not an "employee" under traditional principles of agency law, see, e.g., _Nationwide Mut. Ins. Co. v. Darden_, 503 U.S. 318, 323-324, 112 S.Ct. 1344, 1348-1349, 117 L.Ed.2d 581 (1992), would not count toward the 15-employee minimum. We agree with petitioners that the ultimate touchstone under § 2000e(b) is whether an employer has employment relationships with 15 or more individuals for each working day in 20 or more weeks during the year in question.

The parties' stipulation concerning the number of weeks in 1990 during which Metropolitan satisfied the 15-employee threshold using the payroll approach does not correspond precisely to the counting method petitioners have advocated here. The stipulation was arrived at by counting the number of employees on the payroll in each week of 1990, without regard to whether these employees were employed on each working day of the week. However, subtracting the nine weeks in which Metropolitan experienced mid-week employment changes in 1990 from the 47 weeks of that year in which, according to the parties' stipulation, Metropolitan had employment relationships with 15 or more employees, leaves 38 weeks in which Metropolitan satisfied the 15-employee threshold under the interpretation we adopt. Therefore, Metropolitan was an "employer" within the meaning of § 2000e(b) for purposes of petitioners' retaliatory-discharge claim.

*** 

The judgment of the Court of Appeals is reversed, and the cases are remanded for further proceedings consistent with this opinion.

_It is so ordered._

* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See _United States v. Detroit Timber & Lumber Co._, 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

Brought to you by fastcase   www.fastcase.com
Accelerated legal research.

1-866-77-FASTCASE (866.773.2782)
support@fastcase.com

**Randall A. Gill**

| | |
|---|---|
| **From:** | noreply@fastcase.com |
| **Sent:** | Tuesday, August 05, 2014 4:02 PM |
| **To:** | Gill-Law@swbell.net |
| **Subject:** | Fastcase Document - Davenport v. HansaWorld USA, Inc. |

*(This document has been sent to you from Fastcase by Randall Gill)*

### KIMBERLEE DAVENPORT PLAINTIFF
### v.
### HANSAWORLD USA, INC. and HANSAWORLD HOLDING LIMITED DEFENDANTS

### CIVIL ACTION NO. 2:12-CV-233-KS-MTP

### UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF MISSISSIPPI EASTERN DIVISION

### SO ORDERED AND ADJUDGED: May 20, 2014

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on the Defendant HansaWorld USA, Inc.'s ("HansaWorld USA") Partial Motion to Dismiss or, in the Alternative, for Summary Judgment ("Motion to Dismiss") [69], and the Defendant HansaWorld Holding Limited's ("HansaWorld Holding") Motion to Dismiss [94]. Having considered the submissions of the parties, the record, and the applicable law, the Court finds that both motions should be granted.

### RELEVANT BACKGROUND

Plaintiff Kimberlee Davenport asserts several federal and state law claims against her former employer, HansaWorld USA, in this action. Davenport was employed by HansaWorld USA as a sales manager through a written Contract of Employment [13-4] from January of 2011 to October of 2012. It appears that HansaWorld USA is a software company. HansaWorld USA was incorporated in California in July of 2009, and maintains its principal offices in Florida. HansaWorld USA was registered to do business in Mississippi from February of 2010 to December of 2011. HansaWorld Holding is the parent company and sole shareholder of HansaWorld USA. HansaWorld Holding was organized under the laws of Ireland and maintains its headquarters in that country.

On December 13, 2012, Davenport filed suit against HansaWorld USA and Karl Bohlin (an adult resident citizen of Sweden) in this Court. (*See* Compl. [1].) Subject

Page 2

matter jurisdiction is asserted under Title 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights). Davenport alleges that she experienced sexual harassment by several individuals, and that Bohlin, her direct and immediate supervisor, was the primary perpetrator of the harassment. Davenport further contends that as one of the few U.S. employees of HansaWorld USA, she "was often singled out and ridiculed for her national origin as

Exhibit 3

being an 'American.'" (Compl. [1] at ¶ 15.) Davenport claims that she was wrongfully terminated after complaining about the purported sexual harassment and about HansaWorld USA's alleged disregard of U.S. tax and immigration laws pertaining to employee pay. Based on these and other allegations, the Complaint asserts liability under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), for discrimination based on sex and national origin, retaliation, and hostile work environment. The following state law claims are also included in the Complaint: defamation; malicious interference with employment; intentional and negligent infliction of emotional distress; discharge in violation of public policy; breach of contract; breach of good faith and fair dealing; and negligent supervision and training.

On April 16, 2013, Davenport filed her Amended Complaint [28], joining HansaWorld UK Ltd. and HansaWorld Ireland as Defendants. Through this pleading, Davenport claimed that HansaWorld USA is the alter ego and subsidiary of HansaWorld UK Ltd. and HansaWorld Ireland. Davenport further asserted that all HansaWorld companies share the same Board of Directors. No new causes of action were alleged in the Amended Complaint [28].

On April 23, 2013, HansaWorld USA moved to dismiss the Amended Complaint for lack of personal jurisdiction and improper venue. (*See* Doc. No. [30].) HansaWorld USA alternatively sought to transfer venue to the U.S. District Court for the Southern District of Florida. On September 25, 2013, the Court entered its Memorandum Opinion

Page 3

and Order [45], concluding that dismissal was unwarranted on the grounds urged by HansaWorld USA, and that good cause did not exist for the transfer of this action to the Southern District of Florida.

On October 24, 2013, Davenport's claims against Bohlin, HansaWorld UK Ltd., and HansaWorld Ireland were dismissed with prejudice via an Agreed Order of Dismissal with Prejudice [51].

On January 10, 2014, Davenport filed her Second Amended Complaint [62]. This pleading only names HansaWorld USA and HansaWorld Holding as Defendants. Davenport claims that HansaWorld USA is the alter ego and subsidiary of HansaWorld Holding; that the Defendants share the same Board of Directors and bank accounts; and, that employees "of all HansaWorld companies are fluid and work for and between the HansaWorld sister companies." (2d Am. Compl. [62] at pp. 2-3.) The Second Amended Complaint contains the same causes of action as the original Complaint, minus Davenport's claim for malicious interference with employment against Bohlin.

On January 16, 2014, HansaWorld USA filed its Motion to Dismiss [69]. This motion is aimed only at Davenport's Title VII cause of action. On March 5, 2014, HansaWorld Holding filed its Motion to Dismiss [94]. HansaWorld Holding seeks the dismissal of the Second Amended Complaint [62] on two grounds: (1) lack of personal jurisdiction and (2) insufficient service of process. HansaWorld Holding also joins in HansaWorld USA's request for the dismissal of Davenport's Title VII claims. The subject motions have been fully briefed and the Court is ready to rule.

## DISCUSSION

### I. HansaWorld USA's Motion to Dismiss [69]

HansaWorld USA argues that Davenport's Title VII claims fail because it does not have the requisite number of employees to qualify as a statutory "employer." Under Title

Page 4

VII, an "employer" is defined as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calender year . . . ." 42 U.S.C. § 2000e(b). The term "employee" is defined as "an individual employed by an employer," but does not encompass certain government officials. 42 U.S.C. § 2000e(f). "With respect to employment in a foreign country, such term [employee] includes an individual who is a citizen of the United States." *Id.*

HansaWorld USA contends that dismissal is required under Federal Rule of Civil Procedure 12(b)(6) since the Complaint is devoid of any allegations indicating that it is an employer under Title VII. HansaWorld USA alternatively contends that summary judgment is appropriate on this issue under Federal Rule of Civil Procedure 56.

## A. Federal Rule of Civil Procedure 12(b)(6)

### 1. Standard of Review

To withstand a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also In re Great Lakes Dredge & Dock Co.,* 624 F.3d 201, 210 (5th Cir. 2010) ("To be plausible, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'") (quoting *Twombly,* 550 U.S. at 555). A complaint containing mere "labels and conclusions, or a formulaic recitation of the elements" is insufficient. *Bowlby v. City of Aberdeen, Miss.,* 681 F.3d 215, 219 (5th Cir. 2012) (citation and internal quotation marks omitted). Although courts

Page 5

are to accept all well-pleaded facts as true and view those facts in the light most favorable to the nonmoving party, courts are not required "to accept as true a legal conclusion couched as factual allegation." *Randall D. Wolcott, M.D., P.A. v. Sebelius,* 635 F.3d 757, 763 (5th Cir. 2011) (citations omitted). Ultimately, the court's task "is to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success." *In re McCoy,* 666 F.3d 924, 926 (5th Cir. 2012) (citing *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC,* 594 F.3d 383, 387 (5th Cir. 2010)).

### 2. Analysis

The United States Supreme Court has held that § 2000e(b)'s employee numerosity requirement "is an element of a plaintiff's claim for relief, not a jurisdictional issue." *Arbaugh v. Y & H Corp.,* 546 U.S. 500, 516, 126 S. Ct. 1235, 163 L. Ed. 2d 1097 (2006). Thus, a defendant charged with employment discrimination cannot wait until after the close of evidence to seek and obtain dismissal based on the ground that it employs fewer than fifteen people. *See id.* at 504. There are divergent district court opinions regarding whether a complaint asserting a claim for relief under Title VII must specifically allege the number of employees employed by the defendant in order to survive Rule 12(b)(6) scrutiny. *Compare Prystawik v. BEGO USA,* No. 13-134 S, 2013 WL 2383680, at *2-3 (D.R.I. May 30, 2013) (granting the defendant's motion to dismiss where the complaint did not allege the number of employees), *and Morrow v. Keystone Builders, Inc.,* No. 2:08-4119-CWH, 2010 WL 3672354, at *8 (D.S.C. Sept. 15, 2010) ("Plaintiff's Amended Complaint fails to state a claim for which relief can be granted under Title VII because the Plaintiff fails to allege facts establishing an essential element of her claim—that her employer employed fifteen or more employees."), *with LeBlanc v. Del. County Bd. of Prison Inspectors,* No. 10-3704, 2011 WL 2745800, at *5 (E.D. Pa.

3

Page 6

July 14, 2011) (denying a motion to dismiss with respect to a complaint that presented no specific factual allegations as to the number of individuals employed by the defendant, but pleaded facts allowing the Court to reasonably infer that the numerosity requirement was met), *Powers v. Avondale Baptist Church,* No. 3:06cv363-J-33MCR, 2007 WL 2310782, at *2-3 (M.D. Fla. Aug. 9, 2007) (noting that the employee numerosity requirement is more appropriately considered in the context of summary judgment in denying a Rule 12(b)(6) request for dismissal) (citation omitted), *and Berry v. Lee,* 428 F. Supp. 2d 546, 559 (N.D. Tex. 2006) (denying the defendants' requests for dismissal under Rule 12(b)(6) without prejudice to their ability to move for summary judgment where the complaint did not specifically allege that any defendant employed fifteen or more individuals).

Davenport's Second Amended Complaint [62] does not specify the number of employees employed by HansaWorld USA. However, this pleading and Davenport's Equal Employment Opportunity Commission Charge of Discrimination ("EEOC Charge") [63] clearly assert that HansaWorld USA employed multiple employees. (*See* 2d Am. Compl. [62] at ¶¶ 10, 15, 20, 47; EEOC Charge [63] at p. 1.)[1] Davenport's opposition to the Motion to Dismiss further posits that "at least forty-five (45) employees had an employment relationship with HansaWorld USA." (Davenport's Mem. in Supp. of Opp. to Mot. to Dismiss [73] at ¶ 41.)

A court should not ordinarily dismiss a claim based on a pleading defect without granting leave to amend. *See Hart v. Bayer Corp.,* 199 F.3d 239, 248 n.6 (5th Cir. 2000) (citations omitted). It thus appears that the grant of HansaWorld USA's Rule 12(b)(6)

Page 7

request for dismissal would amount to an exercise in futility and only delay proceedings while Davenport amends the pleadings to assert that HansaWorld USA employed at least forty-five individuals. The Court finds that the dismissal of Davenport's Title VII cause of action under Rule 12(b)(6) would be improvident under these circumstances, and that the employee numerosity requirement should be addressed under Rule 56. *Cf. Powers,* 2007 WL 2310782, at *2-3; *Berry,* 428 F. Supp. 2d at 559.[2]

**B. Federal Rule of Civil Procedure 56**

**1. Standard of Review**

Rule 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where the burden of production at trial ultimately rests on the nonmovant, the movant must merely demonstrate an absence of evidentiary support in the record for the nonmovant's case." *Cuadra v. Houston Indep. Sch. Dist.,* 626 F.3d 808, 812 (5th Cir. 2010) (citation and internal quotation marks omitted). The nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Id.* "'An issue is material if its resolution could affect the outcome of the action.'" *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.,* 627 F.3d 134, 138 (5th Cir. 2010) (quoting *Daniels v. City of Arlington, Tex.,* 246 F.3d 500, 502 (5th Cir. 2001)). "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Cuadra,* 626

Page 8

F.3d at 812 (citation omitted).

The Court is not permitted to make credibility determinations or weigh the evidence. *Deville v. Marcantel,* 567 F.3d 156, 164 (5th Cir. 2009) (citing *Turner v. Baylor Richardson Med. Ctr.,* 476 F.3d 337, 343 (5th Cir. 2007)). When deciding whether a genuine fact issue exists, "the court must view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Sierra Club, Inc.,* 627 F.3d at 138. However, "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *Oliver v. Scott,* 276 F.3d 736, 744 (5th Cir. 2002) (citation omitted). Summary judgment is mandatory "'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Brown v. Offshore Specialty Fabricators, Inc.,* 663 F.3d 759, 766 (5th Cir. 2011) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

## 2. Analysis

HansaWorld USA makes the following pertinent assertions of fact in support of summary judgment: (i) HansaWorld USA "has never employed more than fifteen (15) total employees for each working day in each of twenty or more calendar weeks during any calendar year"; (ii) "all HansaWorld companies combined have never employed fifteen (15) or more United States citizens for each working day in each of twenty or more calendar weeks in any given calendar year"; and (iii) HansaWorld USA employed a total of thirteen (13) people during the calender years of 2010 through 2012, only six (6) of

Page 9

whom are U.S. citizens. (Jay Decl. [69-1] at ¶¶ 3-5.)[3] HansaWorld USA also makes the legal argument that foreign citizens employed abroad do not count toward § 2000e(b)'s employee numerosity requirement.

Davenport's central factual assertion in opposition to summary judgment is that while she was employed by HansaWorld USA, she "regularly worked with and interacted with . . . [forty-five (45) individuals] who had employment relationships with HansaWorld USA". (Davenport Aff. [72-1] at ¶ 3.) Davenport contends HansaWorld USA and HansaWorld Holding are an integrated enterprise[4] that, along with several different HansaWorld branches or companies operating around the globe, employs hundreds of individuals. At times, Davenport refers to the integrated enterprise as "HansaWorld Group". Davenport further disputes HansaWorld USA's argument that non-U.S. citizens are excluded from the employee count under § 2000e(b). As a fall-back argument, Davenport contends the integrated enterprise of HansaWorld Group includes twenty (20) U.S. business partners and that it is reasonable to infer that each business partner employs at least one (1) U.S. citizen.

In rebuttal, HansaWorld USA extensively disputes Davenport's contention that it should be considered an employer of its U.S. business partners' employees. HansaWorld USA also submits the Declaration of Vadims Zuravlovs, "the Chief Legal Advisor for HansaWorld Legal Department," stating that HansaWorld Holding did not have any employees during the calendar years of 2010 through 2012. (Zuravlovs Decl.

Page 10

[81-1] at ¶¶ 2-3.) HansaWorld USA thus asserts that even if it and HansaWorld Holding are considered to be an integrated enterprise, the employee numerosity requirement under Title VII is not met. HansaWorld USA nonetheless admits that "there are other HansaWorld entities organized abroad", and concedes, solely for purposes of the Motion to Dismiss [69], "that the Court may assume that all HansaWorld entities are a single enterprise." (HansaWorld USA's Rebuttal in Supp. of Mot. to Dismiss [91] at p. 22.) HansaWorld USA also assumes (solely for purposes of the subject motion) that it employs "fifteen (15) or more individuals counting foreign employees employed abroad." (HansaWorld USA's Rebuttal in Supp. of Mot. to Dismiss [91] at p. 8.)

HansaWorld USA is willing to make these concessions or assumptions based on two positions: (1) foreign citizens employed abroad do not count in determining whether an entity is an employer under Title VII; and (2) "no HansaWorld company has ever employed fifteen or more U.S. citizens or foreign nationals employed in the U.S. for the requisite period of time under Title VII." (HansaWorld USA's Rebuttal in Supp. of Mot. to Dismiss [91] at p. 23.) Therefore, HansaWorld USA argues that the ultimate issue before the Court is whether foreign citizens employed abroad are included under Title VII's definition of employer.

Upon consideration of the parties' arguments (including the arguments asserted in the briefs, but not specifically addressed above), the Court finds that the resolution of HansaWorld USA's request for summary judgment turns on two issues: (1) whether a foreign citizen employed outside the United States is to be included in the employee count under § 2000e(b); and (2) whether there is sufficient evidence for a reasonable jury to conclude that HansaWorld USA is an employer of its U.S. business partners' employees. Each issue will be addressed in turn.

### a. Whether a Foreign Citizen Employed Outside the United States Is to Be Included in the Employee Count Under 42 U.S.C. § 2000e(b)

Page 11

There is a split in authority on this issue. *Compare Kang v. U. Lim Am., Inc.,* 296 F.3d 810, 816 (9th Cir. 2002) ("The fact that some of the employees of the integrated enterprise are not themselves covered by federal anti-discrimination law [because they are non-U.S. citizens employed abroad] does not preclude counting them as employees for the purposes of determining Title VII coverage.") (citing *Morelli v. Cedel,* 141 F.3d 39, 44-45 (2d Cir. 1998)), *Arroyo-Perez v. Demir Group Int'l,* 762 F. Supp. 2d 374, 388 (D.P.R. 2011) (counting the Canadian employees of one entity along with the Florida-based employees of a related entity to determine the employee headcount), *and Wildridge v. IER, Inc.,* 65 F. Supp. 2d 429, 431 (N.D. Tex. 1999) (providing that employees of foreign entities may be factored into the employee calculation), *with Mousa v. Lauda Air Luftfahrt, A.G.,* 258 F. Supp. 2d 1329, 1335-36 (S.D. Fla. 2003) ("[T]he majority of courts that have addressed the issue have found that foreign citizens employed abroad who work exclusively outside of the United States do not count towards the fifteen-employee jurisdictional minimum.") (citing *Iwata v. Stryker Corp.,* 59 F. Supp. 2d 600, 604 (N.D. Tex. 1999); *Greenbaum v. Svenska Handelsbanken,* 979 F. Supp. 973, 983 (S.D.N.Y. 1997); *Minutillo v. Aqua Signal Corp.,* No. 96 C 3529, 1997 WL 156495, at *2 (N.D. Ill. Mar. 31, 1997); *Russell v. Midwest-Werner & Pfleiderer, Inc.,* 955 F. Supp. 114, 115 (D. Kan. 1997); *Kim v. Dial Serv. Int'l, Inc.,* No. 96 Civ. 3327(DLC), 1997 WL 5902, at *3 (S.D.N.Y. Jan. 8, 1997); *Robins v. Max Mara, U.S.A., Inc.,* 914 F. Supp. 1006, 1009 (S.D.N.Y. 1996); *Rao v. Kenya Airways, Ltd.,* No. 94 Civ. 6103(CSH), 1995 WL 366305, at *2 (S.D.N.Y. June 20, 1995)). The parties have not cited, and the Court has not identified any Fifth Circuit opinion resolving this question.

The Second Circuit's decision in *Morelli,* although an Age Discrimination in Employment Act ("ADEA") case, is the lead authority for the view that foreign employees count under Title VII's employee numerosity requirement. In *Morelli,* the plaintiff alleged

Page 12

violations of the ADEA after she was terminated from her position as an assistant to the manager of the defendant bank's New York office. 141 F.3d at 41. The defendant was a Luxembourg bank and its sole U.S. branch was located in New York. *Id.* The district court dismissed the plaintiff's complaint, finding that the ADEA did not apply to the defendant. *Id.* Under the ADEA, "[a] business must have at least twenty 'employees' to be an 'employer.'" *Id.* at 44 (quoting 29 U.S.C. § 630(b)). The district court limited its employee count to the defendant's New York office, reasoning "that the overseas employees of foreign employers should not be

counted because they are not protected by the ADEA." *Id.* The Second Circuit disagreed with the district court's reasoning:

> But there is no requirement that an employee be protected by the ADEA to be counted; an enumeration, for the purpose of ADEA coverage of an employer, includes employees under age 40, who are also unprotected, *see* 29 U.S.C. § 631(a). The nose count of employees relates to the scale of the employer rather than to the extent of protection.

*Id.* at 44-45. The Second Circuit also referenced several reasons underlying Title VII's employee numerosity requirement (such as, protecting the intimate and personal nature of relationships in small businesses, and the burdens of compliance) since the ADEA was largely modeled on Title VII. *Id.* at 45. The Second Circuit found that none of those reasons supported the applicability of the ADEA turning solely on the size of a foreign employer's U.S. operations. *Id.* Holding that "employees cannot be ignored merely because they work overseas", the Second Circuit vacated the district court's dismissal of the plaintiff's ADEA cause of action. *Id.*

In *Kang,* two of the three judges on the Ninth Circuit's panel found *Morelli* persuasive in holding "that Title VII's definition of 'employee' does not prohibit counting the foreign employees of U.S.-controlled corporations for determining coverage." *Kang,* 296 F.3d at 816. The Defendant U. Lim of America (which was based in the United States and employed less than seven employees) was found to be covered by Title VII

Page 13

since it and U. Lim de Mexico (which was located in Mexico and employed between 50-150 Mexican citizens) were an integrated enterprise. *Id.* at 814-15. The majority considered § 2000e(f)'s reference to U.S. citizens working abroad to be inclusive rather than limiting: "The term 'employee' is defined to *include* U.S. citizens employed by U.S. companies in foreign countries rather than to prohibit counting non-U.S. citizens." *Id.* at 816. Circuit Judge Ferdinand Fernandez viewed the statute differently in dissent:

> [T]he definition of employee does not automatically include all persons working abroad because, if it did, there would be no reason to expressly include United States citizens. Rather, non-United States citizens, who are working abroad, are not employees within the meaning of Title VII and cannot be counted when we decide if an entity is an employer pursuant to 42 U.S.C. § 2000e(b).

*Id.* at 821 (Fernandez, J., dissenting). Judge Fernandez considered this reasoning compatible with the Supreme Court's interpretation of 42 U.S.C. § 2000e-1(a), which exempts certain employees from Title VII coverage. *Id.* Because § 2000e-1(a) renders Title VII inapplicable "'with respect to the employment of aliens outside any State,' it must apply 'with respect to the employment of aliens inside any State.'" *Id.* (quoting *Espinoza Farah Mfg. Co.,* 414 U.S. 86, 95, 94 S. Ct. 334, 38 L. Ed. 2d 287 (1973)). Further, Judge Fernandez disagreed with the Second Circuit's examination of the legislative purposes behind Title VII's employee numerosity requirement in *Morelli.* "[T]he statute speaks with enough clarity to permit (nay require) one to stop with its own words, rather than undertaking to stravage in a wilderness of possible legislative purposes." *Id.* (citation omitted).

Aside from Judge Fernandez's dissent, *Mousa v. Lauda Air Luftfahrt, A.G.,* appears to be the only *judicial* opinion expressly disagreeing with the Second Circuit's

Page 14

holding in *Morelli.*[5] Samir Mousa filed suit against Lauda Air Luftfahrt, A.G. ("Lauda Air"), his former employer, alleging religious discrimination under Title VII and other claims following the termination of his employment. *Mousa,* 258 F. Supp. 2d 1332-33. Lauda Air employed more than fifteen employees, but the vast majority of those individuals were foreign citizens who worked exclusively outside the United States. *Id.* at

7

1334. Lauda Air moved for summary judgment on the basis that it was not an "employer" under Title VII because it lacked the requisite number of domestic employees. *Id.* at 1333. Mousa primarily relied on *Morelli* in arguing that Lauda Air's foreign employees counted toward the fifteen-employee threshold. *Id.* at 1336. Mousa's reliance on *Morelli* was not well taken by the district court.

> Importantly, *Morelli* was an ADEA case and was admittedly contrary to every preceding district court decision. *Id.* at 45 n. 1 ("We do not follow the district courts that have concluded-without apparent exception-that only the domestic employees of a foreign employer are counted."). Additionally, the ADEA counts all workers in its definition of "employee" but extends its protection only to those workers who are over 40 years of age, while Title VII's coverage and definition of "employee" appear co-extensive. Otherwise, businesses could avoid being subject to the ADEA simply by failing to hire enough older workers. No such danger exists under Title VII. Moreover, unlike Title VII, the ADEA does not contain a provision excluding from its application "the employment of aliens outside of any State." 42 U.S.C. § 2000e-1(a). The *Morelli* court did not address this statutory language.
> The Court does not find *Morelli* persuasive and finds, based upon Title VII's statutory language and the near unanimity of lower courts, that Title VII's coverage and definition of "employee" are co-extensive. 42 U.S.C. § 2000e(f) supports this reading of the statute. If the definition of "employee" included all individuals working abroad, there would be no reason for Congress to expressly include United States citizens. Accordingly, the Court finds that foreign citizens based abroad who worked exclusively outside of the United States are not included in the fifteen-employee jurisdictional count.

*Id.* at 1337.

Page 15

In its consideration of the evidence on summary judgment, the district court refined the period of time an employee had to work in the United States before he or she could be factored into the statutory employee count. The court looked to § 2000e(b) in identifying the time period as "for each working day in each of twenty or more calendar weeks". *Id.* at 1339. Thus, Mousa's contention that an employee need only step foot in the United States to be counted was rejected. *Id.* Ultimately, the district court granted summary judgment in favor of Lauda Air because Mousa could only point to eight employees that worked in the United States for a sufficient period of time. *Id.*

The Court finds that *Mousa,* involving Title VII and a foreign employer, squares more firmly with the allegations and claims at issue in this case than does *Morelli* or *Kang.* *Morelli* involved the ADEA. The fact that employees under the age of forty receive no protection under the ADEA, but are still counted for purposes of determining employer coverage does not bear on the Title VII claims at issue here. In *Kang,* a U.S.-based company owned and operated a foreign company. In this suit, it is undisputed that HansaWorld Holding, a foreign entity, is the parent company and sole shareholder of HansaWorld USA. Further, Davenport alleges that HansaWorld Holding maintained control over employment decisions for both companies. This distinction is not without consequence since the anti-discrimination provisions of Title VII are inapplicable "with respect to the foreign operations of an employer that is a foreign person not controlled by an American employer." 42 U.S.C. § 2000e-1(c)(2).

The Court also finds *Mousa*'s holding, "that Title VII's coverage and definition of 'employee' are co-extensive", to be persuasive. 258 F. Supp. 2d at 1337. As noted above, the definition of "employee" under Title VII specifically includes a U.S. citizen working in a foreign country. 42 U.S.C. § 2000e(f). In addition, § 2000e-1 renders Title VII inapplicable "to the employment of aliens outside any State . . . ." 42 U.S.C. § 2000e-

8

Page 16

1(a). It is generally accepted that these provisions negate the application of Title VII to non-U.S. citizens working abroad.[6] The Court discerns no cogent basis for giving effect to these provisions in determining whether an employee is protected by Title VII, while ignoring their existence in determining whether an employer has the requisite number of employees to trigger Title VII coverage. In contexts outside the realm of foreign employment, courts have found that an individual's ability to obtain relief under Title VII affects whether an employer has the requisite number of employees to implicate Title VII's protections.[7] The result should be no different with respect to the issue before this Court, especially given the well-established principle that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 130 S. Ct. 2689 2878, 177 L. Ed. 2d 535 (2010). As a result, the

Page 17

Court holds that foreign citizens employed outside the United States are excluded from the employee head count under 42 U.S.C. § 2000e(b). Only those foreign citizens working inside the United States "for each working day in each of twenty or more calendar weeks in the current or preceding year" should be factored into the fifteen-employee threshold. 42 U.S.C. § 2000e(b).

HansaWorld USA asserts that no HansaWorld company has ever employed fifteen or more employees (U.S. citizen or alien) in the United States for the length of time specified under § 2000e(b). Davenport has failed to evidence facts negating this assertion. The averment that forty-five "employees worked at different HansaWorld Group branches around the world"[8] falls short of establishing that any employee worked in the United States "for each working day in each of twenty or more calendar weeks . . . ." 42 U.S.C. § 2000e(b). Davenport's contention that some of these "employees would be physically in the United States from time to time"[9] is also insufficient. *See Mousa*, 258 F. Supp. 2d at 1339 (rejecting the plaintiff's argument that an employee need only cross the U.S. border to be counted). The Court further finds Davenport's reliance on the Supplemental Affidavit of Stephen Jay [73-7], previously submitted by HansaWorld USA on the issue of personal jurisdiction, to be unavailing. The fact that "HW BA S.R.L., an Argentinian sister company of HansaWorld USA, Inc., . . . house[d] *two employees* in Mississippi" for one year does not establish that any HansaWorld company employed *fifteen* or more individuals in the United States for the required length of time. (Jay Suppl. Aff. [73-7] at ¶ 9) (emphasis added). Therefore, Davenport's Title VII claims will

Page 18

be dismissed due to her failure to meet § 2000e(b)'s employee numerosity requirement unless the issue stated below is resolved in her favor.

**b. Whether There Is Sufficient Evidence for a Reasonable Jury to Conclude that HansaWorld USA Is an Employer of Its U.S. Business Partners' Employees**

The Fifth Circuit has utilized two similar, but distinct tests to determine statutory "employer" status when it is alleged that two or more entities share employees: (1) the single employer test adopted by the Fifth Circuit in *Trevino v. Celanese Corp.*, 701 F.2d 397 (5th Cir. 1983); and (2) the "hybrid economic realities/common law control test". *Schweitzer v. Advanced Telemarketing Corp.*, 104 F.3d 761, 763-64 (5th Cir. 1997) (citations omitted). Davenport relies on both tests in arguing that the employees of HansaWorld USA's U.S. business partners count toward meeting Title VII's employee numerosity requirement. The Court determines that Davenport has failed to evidence a genuine issue for trial under either standard.

**(1) The *Trevino* Single Employer Test**

9

"[S]uperficially distinct entities may be exposed to liability upon a finding that they represent a single, integrated enterprise: a single employer." *Trevino*, 701 F.2d at 404. Factors utilized to determine the existence of a single employer "are (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Id.* (citations omitted). The Fifth Circuit considers the second factor to be the most important, rephrasing and boiling it down to the question "of 'what entity made the final decisions regarding employment matters related to the person claiming discrimination.'" *Turner*, 476 F.3d at 344 (quoting *Chaiffetz v. Robertson Research Holding, Ltd.*, 798 F.2d 731, 735 (5th Cir. 1986)).

As to the factor of highest importance, there is no allegation, much less proof, that any U.S. business partner of any HansaWorld company made an employment decision,

Page 19

final or otherwise, pertaining to Davenport. Further, Stephen Jay avers that "HansaWorld has no authority to hire or fire any of its business partners' employees or make any other employment decisions related to these employees, and these entities have no authority to hire or fire any of HansaWorld's employees, including Plaintiff Davenport." (Jay Suppl. Decl. [91-1] at ¶ 7.) Davenport references the Declaration of Ara Darajkian [83-2], who appears to be a former business partner of HansaWorld USA, in support of her argument that HansaWorld USA and its business partners constitute an integrated enterprise. However, even Ara Darajkian states that "Karl Bohlin, director of HansaWorld, did not have the ability to hire and fire employees of a partner . . . ." (Darajkian Decl. [83-2] at ¶ 9.) The continuation of Darajkian's statement—Bohlin "would attempt to throw his weight around and influence the personnel of business partners"—affects nothing. (Darajkian Decl. [83-2] at ¶ 9.) The test is "what entity made the final decisions regarding employment matters", not what entity *attempted* to influence personnel decisions. *Turner*, 476 F.3d at 344. Therefore, the second *Trevino* factor weighs against Davenport.

Upon review of the summary judgment record, it appears that the relationship between a HansaWorld company and a business partner is a typical business arrangement under which the business partner sells HansaWorld software. Business partners are not prohibited from selling software for other companies. Business partners receive training from HansaWorld, and regularly update HansaWorld concerning sales. Also, HansaWorld controls how business partners sell its software products, to whom the products are sold, and how the products are advertised. Clearly, the operations of HansaWorld and its business partners are related or intertwined for the specific purpose of the sale of software under this arrangement. However, the Court finds no atypical "interrelation of operations" rendering HansaWorld and its business partners a single employer for purposes of Title VII. *Cooley v. Reckitt Benckiser*, No. 3:11cv404, 2012 WL

Page 20

8667577, at *3, 4 (S.D. Miss. July 25, 2012) (finding that the existence of a staffing agreement between the defendants did not make them joint employers under Title VII), *aff'd*, 517 Fed. Appx. 298 (5th Cir. 2013).[10]

The remaining "common management . . . [and] common ownership or financial control" factors do not carry enough weight to tip the scales in favor of aggregation. *See Lusk v. FoxMeyer Health Corp.*, 129 F.3d 773, 777, 778 (5th Cir. 1997) ("Although the appellants produced evidence establishing common management and ownership between NII and its FoxMeyer subsidiaries, these factors alone are insufficient to establish single employer status."). The weight of these factors aside, Stephen Jay's Supplemental Declaration provides that "HansaWorld does not have any common or mutual management at all with any of its business partners . . . . There is also no common ownership or financial control, and HansaWorld maintains its own financial records and statements separate and apart from any of its" business partners. (Jay Suppl. Decl. [91-1] at ¶ 8.) The Court finds nothing in the record refuting these statements.

10

Davenport argues that the following information posted on HansaWorld's website shows that HansaWorld considers the employees of its business partners to be part of "HansaWorld Group": "The group employs around 300 staff in a strong network of daughter companies and distribution partners worldwide." (Doc. No. [83-3 at ECF p. 6].) What Davenport or third parties may be led to believe from viewing the preceding

Page 21

information does not weigh upon the *Trevino* analysis. *See Tipton v. Northrup Grumman Corp.,* 242 Fed. Appx. 187, 190 (5th Cir. 2007) (Plaintiffs' evidence—including press releases and printouts from NGC's corporate website that purportedly led the plaintiffs to believe their employment extended from NGSS to NGC—failed to establish the existence of "genuine issues of fact regarding whether NGSS and NGC had interrelated operations, centralized control of labor or employment decisions, common management, or common ownership or financial control."); *McLaurin v. Fusco,* 629 F. Supp. 2d 657, 662-63 (S.D. Miss. 2009) (finding the plaintiff's belief that she was employed by DMJ *and* Jenny Craig, based on her review of Jenny Craig documents during the hiring process, to be insufficient to avoid summary judgment in favor of Jenny Craig). Ultimately, Davenport has failed to come forward with sufficient facts in support of her argument that HansaWorld USA and its U.S. business partners constitute a single employer.

### (2) The Hybrid Economic Realities/Common Law Control Test

The Fifth Circuit has explained this test as follows:

> In determining whether an employment relationship exists within the meaning of Title VII and the ADEA, we apply a "hybrid economic realities/common law control test." ... The right to control an employee's conduct is the most important component of this test.... When examining the control component, we have focused on whether the alleged employer has the right to hire and fire the employee, the right to supervise the employee, and the right to set the employee's work schedule.... The economic realities component of our test has focused on whether the alleged employer paid the employee's salary, withheld taxes, provided benefits, and set the terms and conditions of employment.

*Barrow v. New Orleans Steamship Assoc.,* 10 F.3d 292, 296 (5th Cir. 1994) (citing *Deal v. State Farm County Mut. Ins. Co. of Tex.,* 5 F.3d 117, 118-19 (5th Cir. 1993)).[11]

Page 22

The hybrid economic realities/common law control test ("hybrid test") is usually employed to determine if a plaintiff has an employment relationship with one or more defendants. Here, however, Davenport seeks to show that the employees of third parties to the litigation are employees of HansaWorld USA for purposes of meeting Title VII's employee numerosity requirement. As pointed out by HansaWorld USA, Davenport's utilization of the hybrid test for this purpose rests on much speculation and conjecture:

> Employing this test to *all* of the employees of *all* twenty companies is impossible in this instance because Plaintiff has not even identified these alleged other employees to allow the Court to engage in such a test. Indeed, Plaintiff's allegations again surround only the terms of the business contracts between HansaWorld and its business partners (i.e., the companies listed in Exhibit D). . . . Similarly, there is no allegation anywhere in any of Plaintiff's responses that addresses the rest of Title VII's definition of an employer. Under Title VII, the definition of employer is one who "has fifteen or more employees *for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.*" 42 U.S.C. § 2000e(b) (emphasis supplied). The only thing Plaintiff does in her responses is ask this Court to assume that the employees of

these entities exist and that they meet the above standard, and then utilize pure academic guesswork to engage in an analysis of whether the individuals are employees of HansaWorld.

(HansaWorld USA's Rebuttal in Supp. of Mot. to Dismiss [91] at p. 21.) HansaWorld USA's point is well taken. "Mere improbable inferences and unsupported speculation are not proper summary judgment evidence." *Zarnow v. City of Wichita Falls, Tex.,* 614 F.3d 161, 169 (5th Cir. 2010) (citation and internal quotation marks omitted).

Page 23

Davenport references her Supplemental Affidavit [83-5] and the Declaration of Ara Darajkian [83-2] in her discussion of the hybrid test. Davenport states that "I was a partner before I was a salaried employee." (Davenport Suppl. Aff. [83-5] at ¶ 6.) As noted above, it appears that Ara Darajkian is a former business partner of HansaWorld. Even assuming *arguendo* that Davenport and Darajkian's former partnerships with HansaWorld are representative of HansaWorld's agreements with the twenty (20) business partners identified in the record, the hybrid test fails to preclude the entry of summary judgment against Davenport.

The Court's preceding analysis as to the *Trevino* single employer test negates any finding that HansaWorld has the right to hire or fire the employees of its business partners. Furthermore, Davenport's opposition to dismissal provides that the "partner is allowed to set their own work schedule . . . ." (Doc. No. [83] at p. 8.) Viewing the facts in the light most favorable to Davenport, it may be reasonably inferred that HansaWorld supervises its business partners with respect to the sale of HansaWorld software. However, it is unreasonable to assume that HansaWorld supervises any and all aspects of the work of its business partners' employees, particularly when the employees may be selling software for a company other than HansaWorld.[12] The "right to supervise" factor does not override "the right to hire and fire" and "right to set the employee's work schedule" considerations. *Barrow,* 10 F.3d at 296. Several economic realties further militate against the existence of an employment relationship between HansaWorld and its business partners. Business partners are paid on commission. (*See* Darajkian Decl. [83-2] at ¶ 8; Davenport Suppl. Aff. [83-5] at ¶ 8.) HansaWorld does not withhold taxes in

Page 24

paying business partners. (Davenport Suppl. Aff. [83-5] at ¶ 8.) "HansaWorld does not provide insurance to partners, . . . [or] require the partner to have their own insurance . . . ." (Doc. No. [83] at p. 8.) The partnership agreements identify the partners as independent contractors. (Doc. No. [83] at p. 5.) No showing has been made that HansaWorld affords its business partners' employees annual leave, or that the employees accumulate retirement benefits from HansaWorld. On the whole, Davenport "shows little more than a scintilla of evidence upon which a jury could find in h[er] favor" under the hybrid test. *Thompson v. Zurich Am. Ins. Co.,* 664 F.3d 62, 68 (5th Cir. 2011) (citation and internal quotation marks omitted).

It is the exception rather than the rule that a contractual relationship between two entities for a particular purpose (such as the sale of products) will render one the employer of the other's employees. Based on the foregoing considerations, the Court concludes that no reasonable jury would find the exception applicable here and deem HansaWorld USA the employer of its U.S. business partners' employees.

### c. Summation

Title 42 U.S.C. § 2000e(b)'s employee numerosity requirement is an element of Davenport's Title VII cause of action. *See Arbaugh,* 546 U.S. at 516. Davenport cannot establish that HansaWorld USA employed "fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or

preceding calender year" under § 2000e(b). Therefore, HansaWorld USA is entitled to judgment as a matter of law on Davenport's Title VII claims.

## II. HansaWorld Holding's Motion to Dismiss [94]

### A. Personal Jurisdiction

A non-resident defendant is amenable to being sued in Mississippi if: (1) Mississippi's long-arm statute confers jurisdiction over the defendant; and (2) the

Page 25

exercise of personal jurisdiction comports with the requirements of federal due process. *See Stripling v. Jordan Prod. Co.,* 234 F.3d 863, 869 (5th Cir. 2000) (citation omitted). The plaintiff must establish personal jurisdiction, but need only present a prima facie case to meet his burden. *See Luv n' care, Ltd. v. Insta-Mix, Inc.,* 438 F.3d 465, 469 (5th Cir. 2006) (citing *Wyatt v. Kaplan,* 686 F.2d 276, 280 (5th Cir. 1982)). "This court must resolve all undisputed facts submitted by the plaintiff, as well as all facts contested in the affidavits, in favor of jurisdiction." *Id.*

HansaWorld Holding asserts that it is not subject to Mississippi's long-arm statute and that it lacks sufficient contacts with Mississippi to render jurisdiction over it constitutional. HansaWorld Holding submits the Declaration of Jennifer O'Carroll [94-1], the Manager for HansaWorld Ireland Ltd., in support of its request for dismissal. O'Carroll's Declaration states, *inter alia,* that HansaWorld Holding has never taken any action in Mississippi; that HansaWorld Holding is not registered to do business in Mississippi; that HansaWorld Holding has never entered into a contract with Davenport or any other individual or entity in Mississippi; that HansaWorld Holding has never owned or leased any property in Mississippi; and that HansaWorld Holding has never advertised in Mississippi. (O'Carroll Decl. [94-1] at ¶¶ 4-9.)

Davenport's opposition to dismissal does not contest the preceding factual assertions presented by the O'Carroll Declaration. Further, Davenport does not present any contrary facts showing that HansaWorld Holding itself engaged in any conduct meeting the requirements for the exercise of personal jurisdiction under Mississippi's long-arm statute or the Due Process Clause. Instead, Davenport argues that HansaWorld USA is the alter ego of HansaWorld Holding, and that the Court's prior personal jurisdiction ruling as to HansaWorld USA also applies to HansaWorld Holding.

Page 26

"Generally, a foreign parent corporation is not subject to the jurisdiction of a forum state merely because its subsidiary is present or doing business there; the mere existence of a parent-subsidiary relationship is not sufficient to warrant the assertion of jurisdiction over the foreign parent." *Hargrave v. Fibreboard Corp.,* 710 F.2d 1154, 1159 (5th Cir. 1983) (citing 2 J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 4.25[6], at 4-272 (2d ed. 1982)). Courts presume corporate separateness, although this presumption may be rebutted by clear evidence of a parent corporation asserting sufficient control over its subsidiary to render the subsidiary its agent or alter ego. *Dickson Marine Inc. v. Panalpina, Inc.,* 179 F.3d 331, 338 (5th Cir. 1999) (citations omitted). "The rationale for such an exercise of jurisdiction is that the parent corporation exerts such domination and control over its subsidiary that they do not in reality constitute separate and distinct corporate entities but are one and the same corporation for purposes of jurisdiction." *Hargrave,* 710 F.2d at 1159 (citations and internal quotation marks omitted). In *Hargrave,* the Fifth Circuit set forth the factors to be utilized in determining whether personal jurisdiction can be exercised over a parent corporation based on the actions of its subsidiary. The *Hargrave* factors are as follows:

(1) amount of stock owned by the parent of the subsidiary; (2) did the two corporations have separate headquarters; (3) did they have common officers and directors; (4) did they observe corporate formalities; (5) did they maintain separate accounting systems; (6) did the parent exercise complete authority over general policy; (7) did the subsidiary exercise complete authority over daily operations.

*Dickson Marine Inc.,* 179 F.3d at 339 (citing *Hargrave,* 710 F.2d at 1160). The plaintiff's prima facie burden of establishing alter ego jurisdiction is less stringent than what is required to establish alter ego liability. *See, e.g., Hargrave,* 710 F.2d at 1161; *Stuart v. Spademan,* 772 F.2d 1185, 1198 n.12 (5th Cir. 1985).

The first three *Hargrave* factors are not in dispute. HansaWorld Holding owns

Page 27

100% of HansaWorld USA's stock. HansaWorld Holding is headquartered in Ireland, while HansaWorld USA maintains its principal place of business in Florida. The two companies share some officers and directors. If the Court's analysis were to stop here, jurisdiction over HansaWorld Holding would be found lacking. *See Alpine View Co. v. Atlas Copco AB,* 205 F.3d 208, 219 (5th Cir. 2000) ("We have said . . . that '100% stock ownership and commonality of officers and directors are not alone sufficient to establish an alter ego relationship between two corporations.'") (quoting *Hargrave,* 710 F.2d at 1160); *Gardemal v. Westin Hotel Co.,* 186 F.3d 588, 594 (5th Cir. 1999) ("'[O]ne-hundred percent ownership and identity of directors and officers are, even together, an insufficient basis for applying the alter ego theory to pierce the corporate veil.'") (quoting *United States v. Jon-T Chems., Inc.,* 768 F.2d 686, 691 (5th Cir. 1985)); *Replogle v. Shoreline Transp. of Ala., LLC,* No. 3:11cv83, 2012 WL 4755039, at *3 (S.D. Miss. Oct. 4, 2012) (finding insufficient proof of an alter ego relationship even though parent and subsidiary entities shared headquarters and the same registered agent for service of process, and the single employee of the parent corporation was the manager of the subsidiary); *Samples v. Vanguard Healthcare, LLC,* No. 3:07cv157, 2008 WL 4371371, at *3-4 (N.D. Miss. Sept. 18, 2008) (declining to exercise personal jurisdiction over a parent company that shared officers and headquarters with its wholly owned subsidiary).

Moving on to the disputed *Hargrave* factors, Davenport states (in affidavit form) that "HansaWorld USA did not exercise any corporate formalities." (Davenport Aff. [98-5] at ¶ 8.) Davenport posits that HansaWorld USA never held any corporate or board meetings, and thus, the company never approved articles of incorporation or kept any minutes. (See Davenport Aff. [98-5] at ¶¶ 9-11.) Davenport claims first hand knowledge of HansaWorld USA's corporate structure based on her prior membership on the company's board of directors and former status as the corporate secretary. (See

Page 28

Davenport Aff. [98-5] at ¶¶ 6-7, 12.) Davenport also states that she helped incorporate HansaWorld USA while she was a contract employee of HansaWorld Ireland. (See Davenport Aff. [98-5] at ¶ 5.) Conversely, Jennifer O'Carroll declares that "HansaWorld Holding and HansaWorld USA maintain corporate separateness and observe corporate formalities." (O'Carroll Decl. [94-1] at ¶ 14.) O'Carroll also states that Davenport never served on the board of any HansaWorld entity and that Davenport was not privy to HansaWorld USA's board meetings or decisions. (See O'Carroll Suppl. Decl. [100-1] at ¶ 2.) HansaWorld USA thus argues that Davenport cannot offer competent testimony regarding the corporate formalities of HansaWorld USA's board.[13]

The factual conflict between Davenport and HansaWorld Holding concerning Davenport's status as a former board member of HansaWorld USA must be resolved in Davenport's favor at this stage of the proceedings. *See Freudensprung v. Offshore Technical Servs.,* 379 F.3d 327, 343 (5th Cir. 2004) (providing that conflicts in jurisdictional facts are to be resolved in the plaintiff's favor) (citation omitted). Thus, the Court finds

Davenport competent to provide testimony regarding HansaWorld USA's corporate inner workings. The Court further accepts Davenport's statements regarding HansaWorld USA's failure to hold board meetings, keep minutes, and approve controlling documents. Nonetheless, the record in this case contains filings militating against the conclusion that HansaWorld USA is a sham corporation. A Certificate of Status issued

Page 29

by the State of California in December of 2009 indicates that HansaWorld USA "is authorized to exercise all of its powers, rights and privileges in the State of California." (Doc. No. [18-4 at ECF p. 5].) In addition, HansaWorld USA registered to do business in Mississippi and appointed Davenport as its registered agent for service of process in February of 2010. (*See* Doc. No. [18-4].) Davenport also fails to submit evidence indicating that HansaWorld Holding did not follow corporate formalities. Davenport admits that HansaWorld Holding held board meetings in Europe. (Davenport Aff. [98-5] at ¶ 12.) The record further reflects that HansaWorld Holding filed separate annual reports. (*See* Doc. No. [73-1].) As a result, the consideration of whether "they [HansaWorld USA and HansaWorld Holding] observe corporate formalities" only slightly weighs in favor of the exercise of personal jurisdiction over HansaWorld Holding. *Dickson Marine Inc.,* 179 F.3d at 339.

The Court resolves the next *Hargrave* factor in the opposite direction. Jennifer O'Carroll states that "HansaWorld Holding and HansaWorld USA maintain separate accounting systems, bank records, and separate financial statements. HansaWorld Holding and HansaWorld USA further do not file consolidated tax returns." (O'Carroll Decl. [94-1] at ¶ 16.) These averments are supported by the existence of several business records pertaining to HansaWorld USA, as opposed to HansaWorld Holding or HansaWorld USA *and* HansaWorld Holding (*See* Invoices [14-5]; Checks [13-5], [14-6]; Employment Records [35-2]; HansaWorld USA Banking Records [98-2].) Davenport's argument that "[b]oth HansaWorld USA and HansaWorld Holding have, or had, the same business departments" is unsupported by the record. (Davenport's Mem. in Supp. of Resp. in Opp. to Mot. to Dismiss [98] at ¶ 16.) There is documentation of financing and financial cooperation between HansaWorld USA and other HansaWorld subsidiaries, such as HansaWorld UK Ltd. and HansaWorld Ireland. (*See* O'Carroll Dep. [98-1] at pp.

Page 30

28-30; HansaWorld USA Banking Records [98-2]; Davenport Banking Records [98-3].) Yet, the relevant entity for purposes of this motion is HansaWorld Holding. *Cf. Lee v. Ability Ins. Co.,* No. 2:12cv17, 2013 WL 2491067, at *2 (S.D. Miss. June 10, 2013) (rejecting the plaintiff's argument "that Ability is an alter-ego of ARH," where the bulk of her evidence pertained "to corporate entities other than ARH"). There is no competent evidence before the Court showing that each and every HansaWorld subsidiary company is the alter ego of HansaWorld Holding, or vice versa. *Cf. Alpine View Co.,* 205 F.3d at 218 (providing that the plaintiffs' prima facie burden was made more difficult due to the existence of multiple levels of subsidiaries; plaintiffs were required to show corporate domination at each level). Furthermore, "[t]he existence of intercorporate loans does not establish the requisite dominance". *Id.* at 219 (citation omitted); *see also Adm'rs of the Tulane Educ. Fund v. Ipsen S.A.,* 450 Fed. Appx. 326, 332 (5th Cir. 2011) (providing that plaintiffs must show a parent corporation's control over a subsidiary's budget to be so extensive they essentially became the same entity) (citation omitted); *Gardemal,* 186 F.3d at 593 (finding that financing arrangements, stock ownership, and shared officers evidenced a typical parent-subsidiary relationship).

Neither Davenport's Affidavit [98-5] nor O'Carroll's Declaration [94-1] is particularly useful in determining the final "complete authority" factors. *Hargrave,* 710 F.2d at 1160. O'Carroll states:

> 17. HansaWorld Holding, as a mere holding company, does not exercise authority over the general policy of HansaWorld USA, and HansaWorld USA's policy obligations are completely

separate from HansaWorld Holding.
18. HansaWorld USA exercises complete authority over its daily operations, and it runs its own business operations from and in Florida.

(O'Carroll Decl. [94-1] at p. 2.) Davenport avers:

13. HansaWorld USA took all directives from HansaWorld Holding.

Page 31

HansaWorld USA was not autonomous.
14. To the best of my knowledge, no other HansaWorld subsidiary company operates as its own company. All other companies operate the same as HansaWorld USA and take directives directly from the HansaWorld Holding board.

(Davenport Aff. [98-5] at p. 2.) The Court finds these statements too conclusory to offer enlightenment on the issue of personal jurisdiction. *Cf. Clark v. America's Favorite Chicken Co.,* 110 F.3d 295, 297 (5th Cir. 1997) ("Unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment.") (citation omitted); *Galindo v. Precision Am. Corp.,* 754 F.2d 1212, 1221 (5th Cir. 1985) ("[T]he affidavit's statement that Georgia-Pacific is not engaged in the business of selling sawmill trimmers is merely a conclusion which could not shift the summary judgment burden . . . .").

Setting aside the above-quoted averments (and other bare allegations contained in the parties' briefs), there is some evidence that members of HansaWorld Holding's board were involved in general policy considerations, such as employment matters, at HansaWorld USA. *See Hargrave,* 710 F.2d at 1160. It appears that a board member of HansaWorld Holding, Elar Tammeraja, notified Davenport of her termination from HansaWorld USA. (*See* Doc. No. [98-4].) Davenport's statement that HansaWorld Holding selected HansaWorld USA's Country Manager,[14] comports with certain immigration filings providing that the "Country Manger oversees the US operations and reports directly to the CEO of the group." (*See* Doc. No. [101-1 at ECF p. 8].) Jennifer O'Carroll has testified at deposition that Karl Bohlin, a member of HansaWorld Holding's board,[15] is "the CEO of the company." (O'Carroll Dep. [98-1] at p. 13.) It is far from

Page 32

clear, however, that the entity HansaWorld Holding, as opposed to individuals on the boards of two or more HansaWorld companies, exercised authority over HansaWorld USA's general policies. In any event, it is not uncommon for a wholly-owned subsidiary to cede control over general policies and procedures to its parent owner. *Cf. United States v. Bestfoods,* 524 U.S. 51, 72, 118 S. Ct. 1876, 141 L. Ed. 2d 43 (1998) ("[A]ctivities . . . which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability.") (citation omitted). Several Fifth Circuit opinions reflect a judicial unwillingness to equate control over policy matters with the blurring of corporate lines in determining personal jurisdiction.[16]

There is also evidence of HansaWorld USA exercising authority over its daily operations. As referenced above, certain business records reflect that HansaWorld USA submits separate invoices, maintains its own bank account, writes checks on the account, receives payments for its own sales, and maintains separate employment records for its employees. (*See* Invoices [14-5]; Checks [13-5], [14-6]; Employment Records [35-2]; HansaWorld USA Banking Records [98-2].) It is further undisputed that

16

Page 33

Davenport contracted with "HansaWorld USA, Inc." for employment. (Contract of Employment [13-4].) Based on the totality of the preceding circumstances, the Court determines that there is an absence of clear evidence indicating that HansaWorld Holding "dominates . . . [HansaWorld USA] to the extent that . . . [HansaWorld USA] has, for practical purposes, surrendered its corporate identity." *Gardemal,* 186 F.3d at 594. Even through the viewpoint of Davenport's prima facie burden, the "corporate separation [at issue here], though perhaps merely formal, [i]s real. It [i]s not pure fiction." *Hargrave,* 710 F.2d at 1160 (quoting *Cannon Mfg. Co. v. Cudahy Packing Co., 276 U.S. 333,* 337, 45 S. Ct. 250, 69 L. Ed. 634 (1925)).

Davenport has failed to show that HansaWorld Holding itself engaged in any conduct rendering it amenable to being sued in Mississippi. Further, the Court finds that HansaWorld USA's contacts with Mississippi may not be imputed to HansaWorld Holding based on a purported alter ego relationship between the two entities. Therefore, HansaWorld Holding will be dismissed from this cause for lack of personal jurisdiction. The Court need not address HansaWorld Holding's remaining bases for dismissal given this ruling.

### III. Subject Matter Jurisdiction over Davenport's Remaining State Law Claims

HansaWorld USA has posited that "if the district court dismisses the federal cause of action, it will then have discretion to dismiss, without prejudice, the state law actions." (Doc. No. [90] at ¶ 3.) The accuracy of this statement depends on whether the Court has original diversity jurisdiction or supplemental jurisdiction over Davenport's state law claims. Supplemental jurisdiction under 28 U.S.C. § 1367 is discretionary and a court may decline to exercise it when only pendent state causes of action remain in a proceeding. *See St. Germain v. Howard, 556 F.3d 261,* 263-64 (5th Cir. 2009) (citing 28 U.S.C. § 1367(c)). Conversely, when the district court has original diversity "jurisdiction

Page 34

over state law claims, the exercise of that jurisdiction is mandatory." *Cuevas v. BAC Home Loans Servicing, LP, 648 F.3d 242,* 250 (5th Cir. 2011). There is presently insufficient information before the Court regarding the jurisdictional basis for Davenport's state law claims at the time this suit was filed.[12] Even assuming that § 1367 is the controlling statute, the parties have not briefed whether the Court should exercise its discretion in favor of dismissal or retention. Therefore, the Court will require briefing from the parties on these issues before determining the future course of Davenport's state law claims.

**CONCLUSION**

For the foregoing reasons:

IT IS ORDERED AND ADJUDGED that HansaWorld USA, Inc.'s Motion to Dismiss [69] is granted and Plaintiff's Title VII claims are dismissed with prejudice.

IT IS FURTHER ORDERED AND ADJUDGED that HansaWorld Holding Limited's Motion to Dismiss [94] is granted and this Defendant is dismissed from this action without prejudice for lack of personal jurisdiction.

IT IS FURTHER ORDERED AND ADJUDGED that within twenty-one (21) days of the entry of this Order, Plaintiff and HansaWorld USA, Inc. shall each submit a memorandum brief limited to twenty-five (25) pages in length addressing the following issues: (1) whether the Court has subject matter jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1332 or § 1367; and (2) if 28 U.S.C. § 1367 is the applicable statute, whether the Court should exercise its discretion to dismiss the state law claims without prejudice.

Page 35

*Keith Starrett*
UNITED STATES DISTRICT JUDGE


--------

Notes:

¹ The Court may consider Davenport's EEOC Charge [63] without running afoul of Rule 12(b)(6) since it is referenced in the Complaint and is a matter of public record. *See Thomas v. Lowe's Home Ctrs., Inc.,* No 13-0779, 2014 WL 545862, at *2 n.5 (W.D. La. Feb. 10, 2014) (citations omitted).

² Federal Rule of Civil Procedure 12(d) requires that all parties be given a reasonable opportunity to present pertinent materials when a request for dismissal under Rule 12(b)(6) or 12(c) is treated as a motion for summary judgment. This notice requirement has been satisfied here given HansaWorld USA's request for summary judgment in the alternative, and given the parties' submission of matters outside the pleadings on the subject motion.

³ Stephen Jay is HansaWorld USA's Country Manager. (Jay Decl. [69-1] at ¶ 2.)

⁴ A court may find two or more entities to constitute an integrated enterprise (i.e., a single employer) for purposes of Title VII upon the consideration of four factors: "(1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control." *Turner,* 476 F.3d at 344 (citing *Vance v. Union Planters Corp.,* 279 F.3d 295, 297 (5th Cir. 2002)).

⁵ *But see* Matthew H. Hawes & W. Scott Hardy, *Morelli v. Cedel: Ignoring Jurisdictional Limits and Outflanking Congress Towards the Internationalization of the ADEA,* 65 U. Pitt. L. Rev. 507 (2004).

⁶ *See, e.g., Shekoyan v. Sibley Int'l,* 409 F.3d 414, 422 (D.C. Cir. 2005) ("Title VII does not extend extraterritorially to any person who is not an American citizen."); *Mota v. Univ. of Tex. Houston Health Sci. Ctr.,* 261 F.3d 512, 524 n.34 (5th Cir. 2001) ("Title VII does not govern aliens employed outside the United States."); *Iwata,* 59 F. Supp. 2d at 604 ("Non-citizens working outside the United States are not protected because they are not considered employees.").

⁷ *See Mariotti v. Mariotti Bldg. Prods., Inc.,* 714 F.3d 761, 766 (3d Cir. 2013) ("[T]he definitions of 'employer' and 'employee' set forth in both the ADA and Title VII are relevant in resolving (1) whether an entity qualifies as an 'employer' under Title VII, and (2) whether an individual is an 'employee' who 'may invoke [Title VII's] protections against discrimination[.]'") (quoting *Clackamas Gastroenterology Assocs., P. C. v. Wells,* 538 U.S. 440, 446 n.6, 123 S. Ct. 1673, 155 L. Ed. 2d 615 (2003)), *cert. denied,* 134 S. Ct. 437 (2013); *Smith v. Castaways Family Diner,* 453 F.3d 971, 986 (7th Cir. 2006) ("Characterizing someone as an employer rather than an employee directly affects the reach of Title VII in two different ways[:]" (1) the individual may be precluded from filing suit since it is thought that only employees are entitled to invoke the statute; and (2) "treating an individual as an employer excludes him or her from the workers who will be counted towards the fifteen-employee threshold . . . .") (citations omitted); *cf. Auld v. Law Offices of Cooper, Beckman & Tuerk,* 981 F.2d 1250, 1992 WL 372949, at *1-2 (4th Cir. Dec. 18, 1992) (finding that partners of the defendant law firm could not be factored into the employee head count since partners are not considered to be employees for purposes of Title VII).

⁸ (Davenport Aff. [72-1] at ¶ 4.)

⁹ (Davenport's Mem. in Supp. of Opp. to Mot. to Dismiss [73] at ¶ 56.)

¹⁰ In contrast, the Fifth Circuit has found evidence of the interrelation of operations where two entities operated from the same building; one entity used the other for supplies and secretarial support; one entity did not account for the time its employees spent performing work for the other; and, one entity's personnel director responded to an EEOC charge from an individual employed by the other entity. *See Johnson v. Crown Enters., Inc.,* 398 F.3d 339, 343 (5th Cir. 2005).

¹¹ At times, the Fifth Circuit has referenced eleven (11) separate factors pertaining to the economic realities of employment: "(1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the 'employer' or the individual in question

furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated, i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the 'employer'; (9) whether the worker accumulates retirement benefits; (10) whether the 'employer' pays social security taxes; and (11) the intention of the parties." *Bloom v. Bexar County, Tex.,* 130 F.3d 722, 726 n.3 (5th Cir. 1997) (citing *Spirides v. Reinhardt,* 613 F.2d 826, 832 (D.C. Cir. 1979)).

12. Each business partner that Davenport contends is likely to employ one (1) U.S. citizen appears to be a company or entity, as opposed to an individual. (*See* Doc. No. [83-4].)

13. HansaWorld Holding further argues that Davenport's allegations regarding HansaWorld USA should be disregarded since they concern matters that allegedly existed months before the complaint was filed, and personal jurisdiction is to be determined at the time of the filing of the complaint. The Fifth Circuit opinion cited by HansaWorld Holding merely holds that events occurring "after the filing of the complaint" are irrelevant for determining jurisdiction. *Asarco, Inc. v. Glenara, Ltd.,* 912 F.2d 784, 787 n.1 (5th Cir. 1990). No authority has been presented to the Court ruling that circumstances existing weeks, months, or years *prior* to the initiation of an action are to be disregarded for jurisdictional purposes.

14. (*See* Davenport Aff. [98-5] at ¶ 17.)

15. (*See* Doc. No. [73-1] at p. 3.)

16. *Ipsen, S.A.,* 450 Fed. Appx at 331 (affirming the district court's dismissal of a parent corporation where the corporation exercised significant control over its subsidiary's policies, "but no more than appropriate for a wholly-owned subsidiary"); *Turan v. Universal Plan Invs. Ltd.,* 248 F.3d 1139, 2001 WL 85902, at *3 (5th Cir. Jan. 24, 2001) (finding that the plaintiffs failed to show clear evidence of an alter ego relationship even though the parent corporation exercised authority over the subsidiary's general policies and daily operations); *Dalton v. R & W Marine, Inc.,* 897 F.2d 1359, 1363 (5th Cir. 1990) (holding that Midland Enterprises could not be considered the alter ego of its subsidiaries despite its responsibility for their general policies); *Hargrave,* 710 F.2d at 1160-61 (The policymaking authority exercised by the parent company—approving sizeable capital investments, hiring and firing the subsidiary's officers, and selecting product lines—"was no more than that appropriate for a sole shareholder of a corporation . . . .").

17. It is well established that subject matter jurisdiction "'depends upon the state of things at the time of the action brought.'" *Grupo Dataflux v. Atlas Global Group, L.P.,* 541 U.S. 567, 570, 124 S. Ct. 1920, 158 L. Ed. 2d 866 (2004) (quoting *Mollan v. Torrance,* 9 Wheat. 537, 539, 6 L. Ed. 154 (1824)).

--------

Brought to you by fastcase   www.fastcase.com
Accelerated legal research.

1-866-77-FASTCASE (866.773.2782)
support@fastcase.com